## Evans and others *vs.* Harris and others.

The plaintiffs, in November, 1851, had a quantity of hemlock and spruce logs in M. where they resided, and on the 24th of that month they entered into a contract of sale with the defendants, who resided at Glens Falls, by which they agreed to deliver between 2500 and 3000 of one kind, and from 500 to 1000 of the other, at Ferris' bank near P., at so much per hundred logs.   The logs were then piled, ready to draw to the place of delivery.   During the ensuing winter, about 3750 of the logs were measured and marked with the marking ·iron of the defendants.   The contract was made by letters between the parties, and payments of certain sums were to be made on the first of January, first of March, and 1st of May, 1852.   The second letter of the plaintiffs stated that the balance was to be paid in cash "when you receive the logs at Glens Falls." But their last letter, after specifying the three first payments as before, ran thus; "the balance in cash on the 1st of July 1852, at which time or before you would probably have received them at the Falls.   We prefer appointing 1st of July for the last payment in place of when the logs are received at the Falls, as it is better for both parties, for there is no question they would be received at Glens Falls by that time, and leave no chance for dispute."   The defendants in their answer alleged that not over 1000 logs had been delivered at Ferris' bank, upon which allegation the plaintiffs took issue, in their reply, alleging that over 2000 were so delivered.   Also insisting that such delivery was not necessary to a recovery.   It did not appear that over 1000 of the logs were delivered at Ferris' bank, and the defendants made the three first payments, which exceeded, in amount, the price of 1000 logs.   In an action for 3750 logs "sold and subsequently delivered." *Held,* that by the terms of the contract, whatever logs the plaintiffs delivered on the contract, must be delivered at Ferris' Bank certainly as soon as the 1st of July, if not soon enough to enable the defendants to get them to Glens Falls by that time.   And that, as the plaintiffs had received pay for more than they had so delivered, they could not recover.

*Held also,* that, as the logs were to be delivered before the time fixed for the last payment, delivery was a condition precedent to the payment, although a portion of the purchase money was to be paid before delivery.

The rule now is not, that if covenants be once established to be independent, they in all cases remain so throughout.

The cases of *Terry* v. *Duntze,* (2 *H. Bl.* 389;)  *Seers* v. *Fowler,* (2 *John.* 272;) *Havens* v. *Bush,* (*Id.* 387;) and *Wilcox* v. *Ten Eyck,* (5 *Id.* 78,) overruled. *Boon* v. *Eyre,* (1 *H. Bl.* 272, *note,*) and *Campbell* v. *Jones,* (6 *T. R.* 570,) commented upon.

The subject of dependent and independent covenants and agreements, discussed.

An action will not lie for goods sold and *delivered* where there has been no delivery.   There must be an actual or constructive delivery.   The plaintiff must show the goods were actually delivered, or that he has enabled the defendant to remove them.   To sustain a general count in assumpsit, the special agree-

Evans *v.* Harris.

ment must have been so performed as to leave a mere simple debt or duty between the parties.

When the delivery is to be at a distant place, as between the vendor and vendee the contract is ambulatory till delivery.

Marking goods is an equivocal act; and may be for the purpose of taking possession; or merely for that of identity; or it may be evidence of acceptance.

If any thing remains to be done to the goods by the vendor, as counting, weighing, &c. no title passes.

On a sale of a specific chattel, the property therein may pass, without delivery.

THIS was an appeal from a judgment rendered at a special term, after a trial at the Warren county circuit before Justice WILLARD, without a jury. No proof was given by either party. The complaint alleged that the plaintiffs, being copartners, on or about the 24th of November, 1851, at Minerva, in the county of Essex, sold and subsequently delivered to the defendants (who were at that time copartners also,) a large quantity of logs, at the prices below specified, viz. 800, 86-361 spruce logs at the price of sixty dollars per hundred, and 2951 116-361 hemlock logs for the price of forty dollars per hundred, amounting in the whole to the sum of $1660.67, which the defendants agreed to pay the plaintiffs as follows, to wit: twenty barrels of flour, and five barrels of pork, all at cash prices, to be delivered to the plaintiffs before the 1st day of January, 1852; $300 on the 1st day of March, 1852; $300 on the 1st day of May, 1852; and the balance of said purchase money on the 1st day of July, 1852. The plaintiffs averred that the defendants had not complied with their said promises, as they had not paid the said balance of purchase money due as aforesaid on the 1st day of July, 1852; but that, on the contrary, there still remained due and owing to the plaintiffs, from the defendants, the sum of $875.75; for which sum, with interest from July 1, 1852, with costs, the plaintiffs demanded judgment.

The defendants, in their answer, alleged that on or about the 9th of October, 1851, they received a letter from the plaintiffs, which was set out, at length, in the answer, in which the plaintiffs stated that they had bought about 3000 peeled merchantable hemlock logs and about 1000 merchantable spruce logs, and that as it was about time to contract them they thought best

to ask the defendants what they would give for the logs " at the bridge in this town, a short distance north of Barnes' mills ; or if we should prefer, what will you pay for them, delivered at Ferris' bank, Pottersville," &c.   The defendants, in their reply, expressed a readiness to buy, and several other letters passed between the parties, in respect to the terms and conditions of the purchase.   On the 23d.of October, 1851, the defendants received a letter from the plaintiffs, saying, "If we can agree upon the price for our hemlock and spruce logs we will deliver them to Ferris' bank below the stone bridge, where logs are generally sold that drive past Pottersville, and only a short distance from Pottersville ; and would be willing to make the terms as easy as possible, viz :   20 bbls. flour, and 5 ditto mess pork, between this time and 1st Jan. next ; $300 1st March, 1852 ; $300 1st May, 1852 ; the balance in cash when you receive the logs at Glens Falls."   On the 30th of October, 1851 the defendants replied to this letter as follows : " We will say, in regard to your spruce and peeled hemlock logs, we will take them, on the terms of payment you propose in your letter, delivered at Ferris' bank, below the stone bridge, and pay for spruce 60 cents, and hemlock 40 cents, market logs."   The plaintiffs answered this letter, on the 24th of November, 1851, saying " they [the logs] are now skidded, ready for marking and measuring ; we can safely say that we will deliver to the Ferris Bank, near Pottersville, from 2500 to 3000 peeled merchantable market logs at $40 per hundred market logs ; and from 500 to 1000 merchantable spruce logs, at $60 per hundred, market logs, on the following terms ;   20 bbls. sup. flour and 5 ditto northern mess pork, between this time and 1st June 1852 at cash prices ; $300 1st March, 1852 ; $300 1st May, 1852, and the balance in cash on the 1st July, 1852, at which time, or before, you would probably have received them, at the Falls.   We prefer appointing 1st July for the last payment, in place of when the logs are received at the Falls, as it is better for both parties, for there is no question they would be received at Glens Falls by that time, and leave no chance for dispute.   Do you wish to send a person to mark

and measure ?  If so, please send this week, as the parties are anxious to draw ; or we will choose a trusty man to mark and measure, by your sending your marking hammer." The defendants alleged that the letters set forth in the answer constituted a contract and the only contract ever made between the parties for the sale and delivery by the plaintiffs, to the defendants, of a quantity of logs ; that the logs mentioned therein were the same mentioned in the plaintiffs' complaint ; that in the winter of 1851 and 1852 one Gilbert Hewit measured a quantity of said logs, in pursuance of said contract, and marked the same with the marking hammer of the defendants ; that the hemlock logs so marked and measured numbered $2952\frac{70}{100}$, and the spruce logs only $796\frac{52}{100}$ ; and the defendants averred that they paid the plaintiffs the first payment mentioned in the contract, the sum of $300 payable on the 1st day of March, 1852, and the sum of $300 payable on the 1st day of May, 1852. And they insisted that by the terms of the contract the plaintiffs were bound to deliver the said logs at "Ferris' bank, below the stone bridge, where logs are generally sold that drive past Pottersville ;" and that they, the defendants, were not bound to pay the balance unpaid of the contract price of said logs, until the same were so delivered, and they averred that the said logs had not been delivered, at said Ferris' bank ; that a very small portion only, not exceeding one thousand, of said logs had been delivered at said Ferris' bank.  And the defendants denied that the plaintiffs sold and delivered to them a quantity of logs, or any logs, as in said complaint was alleged ; and they denied each and every allegation in the complaint inconsistent with the averments and admissions in the answer.

In their reply the plaintiffs denied that by the terms of the contract the defendants were not bound to pay the balance unpaid of the contract price of the logs until the same were delivered at Ferris' bank below the stone bridge where logs are generally sold that drive past Pottersville.  And the plaintiffs insisted that said balance was due and payable on the 1st day of July, 1852.  And they denied that a very small portion only, not exceeding ·1000, of said logs, had been delivered at said

Ferris' bank; but on the contrary, the plaintiffs averred that more than 2000 of said logs had been so delivered. ·

The judge found as facts, the making of the contract as set forth in the answer; that the defendants had paid to the plaintiffs all except the last payment, which became due July 1, 1852, which was the sum of $875.75, which was still due, with the interest thereon; that the plaintiffs agreed to deliver the lumber at Ferris' bank, near Pottersville, but the contract did not state at what time they were to deliver it; that the title to the lumber passed to the defendants as soon as it was set apart and marked with the defendant's hammer. And as conclusions of law, he decided that the delivery of the lumber by the plaintiff at Ferris bank was not a condition precedent to a recovery, but that they were bound to deliver it there in a reasonable time, on the request of the defendants. And that the plaintiffs were entitled to recover of the defendants the sum of $893,62, being the last payment, due July 1, 1852, and interest thereon. The defendants appealed. ·

*L. H. Northrup*, for the plaintiffs.

*E. H. Rosekrans*, for the defendants.

*By the Court*, HAND, P. J. The defendants insist that the delivery of the logs on Ferris' bank was a condition precedent to the last payment. No evidence whatever was given in the cause, and we cannot ascertain the location of " Ferris' bank," unless that can be done from the five letters embodying the contract. Of these the three from the plaintiffs were dated at Minerva; the two from the defendants, at Glens Falls. And it appears from them that the logs, at the time of the correspondence, were in Minerva, and that Ferris' bank was near Pottersville. From some expression used, it is probable this place is on Trout brook, and that the logs were to be floated from there to their ultimate destination at Glens Falls. Perhaps we cannot notice the mode of doing business so local, aside from the pleadings, and without proof. The second letter of the

plaintiffs, appointed the time for receiving the three first payments, and then added "the balance in cash when you receive the logs at Glens Falls." · These terms were acceded to by the second letter of the defendants ; but the plaintiffs wrote a third in which, after repeating the terms in respect to the three first payments, they added, "and the balance in cash on the 1st of July 1852, at which time, or before, you will probably have received them at the Falls. We prefer appointing 1st of July for the last payment, in place of when the logs are received at the Falls, as it is better for both parties, for there is no question they would be received at Glens Falls by that time, and leave no chance for dispute." The defendants could not take the logs to Glens Falls without performance by the plaintiff. The last letter was written in November, and the logs were then skidded and persons were "anxious to draw ;" and this bank was the place where logs were "generally sold that drive past Pottersville." I understand the true construction of this contract to be, that the plaintiffs were to deliver the logs on Ferris' bank in time to enable the defendants to take them to Glens Falls ; and certainly, before the 1st of July.

It is admitted that the plaintiffs have received the three first payments, which it appears were more than $780. The defendants, in their answer, state that not over one thousand logs were delivered at Ferris' bank. The plaintiffs in their reply, take issue upon this, and aver that over 2000 were delivered, but there was no proof. The *onus* was upon the plaintiffs, and it must be considered as true that not over one thousand—less than what have been paid for—have been delivered.

If the contract had fixed no time for the delivery of the logs, or a time which might happen after the day of payment, the plaintiffs, as the money was to be paid on a fixed day, could sue for the latter, without averring or proving performance on their part ; within the familiar rule in the note to *Pordage* v. *Cole*, (1 *Saund. R.* 320, *and notes.*) Certainly that is so, if a suit for the payment is brought before the expiration of the time for the delivery. (*Judson* v. *Bowden*, 1 *Exch. R.* 162. *Har-*

*rington* v. *Higgins*, 17 *Wend.* 376.) But as they were to perform before the time of making the payment in question, they cannot recover, as on an executory contract. (1 *Saund. R.* 320, *and notes. Cunningham* v. *Morrell*, 10 *John.* 203. *Johnson* v. *Wygant*, 11 *Wend.* 48. *Dey* v. *Dox*, 9 *id.* 132. *Glazebrook* v. *Woodrow*, 8 *T. R.* 366. *Allen* v. *Cameron* 1 *Cr. & M.* 832. *Chanter* v. *Lease*, 4 *M. & W.* 295. *S. C.* 5 *id.* 698. *Ellen* v. *Topp*, 4 *Eng. Law & Eq. Rep.* 412.) The stipulations here are not to be deemed independent because they go only to a part of the consideration. (1 *Saund.* 320, *n.* 4. *Boone* v. *Eyre*, 1 *H. Bl.* 273, *note a. S. C.* 2 *W. Bl.* 1312. *Campbell* v. *Jones*, 6 *T. R.* 570.) In these cases, and I believe in every case where that rule has been properly applied, great injustice would have been done by holding the covenants to be dependent. The consideration was not in its nature divisible, and the payments could not be apportioned by the terms of the contract. If the annuity in *Boone* v. *Eyre*, had been payable solely in consideration of the transfer of the negroes; or the £250 sued for in *Campbell* v. *Jones* had been the sole consideration of the instruction, and that was to be given before it became due, and if the defendants in those cases had received no advantage whatever, and the whole consideration had failed, the cases would probably have been differently decided. Whenever this third rule of Mr. Sergeant Williams has prevailed, it has been to prevent injustice. (*Id. and see Franklin* v. *Miller*, 4 *A. & E.* 599; *Stavers* v. *Curling*, 3 *Bing. N. C.* 355; *Tompkins* v. *Elliott*, 5 *Wend.* 496; *Bennet* v. *Pixley*, 7 *John.* 249; *Fishmongers Co.* v. *Robertson*, 5 *M. & G.* 131.) *Grant* v. *Johnson*, (5 *Barb* 162; *S. C.* 6 *Id.* 337,) applied that rule with some stringency and is hardly reconcilable with some other cases. (*Johnson* v. *Wygant, supra. Glazebrook* v. *Woodrow, supra. Green* v. *Reynolds*, 2 *John.* 207. *Manby* v. *Cremonini*, 11 *Eng. L. & E. R.* 573. *S. C.* 6 *Exch. R.* 808. *Slocum* v. *Despard*, 8 *Wend.* 619.) *Terry* v. *Duntze* (2 *H. Bl.* 389,) can hardly be considered as law in this state since the cases of *Cunningham* v. *Morrell*, (*supra*,) *and Thompson* v. *Elliott*, (*supra.*) And see *Glazebrook* v. *Woodrow*,

(*supra.*)   *Slocum* v. *Despard*, (8 *Wend.* 619.)   *Manby* v. *Cremonini*, (*supra.*)   And the same may be said of *Seers* v. *Fowler*, (2 *John.* 272,) and *Havens* v. *Bush*, (*Id.* 387.)   And the court put *Wilcox* v. *Ten Eyck*, (5 *John.* 78,) solely upon those cases, before they were overruled.   I do not understand the rule now to be that if covenants be once established to be independent, they in all cases continue so, throughout.   It is true, there are a few English cases, beside *Terry* v. *Duntze*, which seem to favor such a principle; but I think no such construction should be put upon Sergeant Williams' first or third rule.   Pollock, C. B. in *Ellen* v. *Topp*, (6 *Exch. R.* 441, *S. C.* 4 *Eng. L. & E. R.* 419,) in speaking of what portion of the consideration the defendant must have had to apply this third rule, the covenant of the plaintiff being the consideration for that of the defendant, and that having been performed, in part, and the defendant objected that the residue had not been, said " that residue must be the *substantial part of the contract ;* and if in the case of *Boone* v. *Eyre*, two or three negroes had been accepted, and the equity of redemption not conveyed, we do not apprehend that the plaintiff could have recovered the whole stipulated price, and left the defendant to recover damages for the non-conveyance of it."   The American editor of *Smith's Lead. Cases*, (2 *Vol.* 10, [16],) inclines to put the rule on the ground, that part of the consideration has been accepted and enjoyed by the defendant, and the plaintiff has no other remedy than on the covenant, and there can be compensation in damages.   Mr. Smith also cites *Stavers* v. *Curling* as illustrative of the rule. Tindall, C. J. there said, that whether covenants were dependent or independent of each other, was " to be determined by the intention and meaning of the parties, as it appeared in the instrument, and by the application of common sense to each particular case; to which intention, when once discovered, all technical forms of expression must give way." When the defendant has received a substantial part of the consideration of the covenant which is being enforced against him, and the covenants and consideration in their nature cannot be apportioned, they should be considered independent.   But, certainly in contracts

not under seal, a failure of the entire consideration, or a failure affecting the entire consideration, may be a defense. (*Chanter* v. *Leese, supra. And see Duke of St. Albans* v. *Shore,* 1 *H. Bl.* 270.) And however the rule may be as to covenants for the sale of lands, or for title, there is no difficulty in this case in apportioning the consideration, as in *Ritchie* v. *Atkinson,* (10 *East,* 295,) where the rate of compensation was so much *per* ton, and the sum to be recovered, as Ld. Abinger said, (4 *M. & W.* 303,) apportioned itself. (*And see Allen* v. *Cameron,* 1 *Cr. & M.* 832.) I cannot think, in such a case, the plaintiffs may recover without performance, merely because the defendants were to pay part of the price before the property, or all of it, was to be delivered. The case might have been different, if the time of performance by the plaintiffs had not arrived. (*Judson* v. *Bowden,* 1 *Exch. R.* 162. *Tompson* v. *Eliott, supra. Franklin* v. *Miller, supra. Harrington* v. *Higgins,* 17 *Wend.* 376.) Without reference to the effect the code, as now amended, may have upon a defense in such case, I am of the opinion that, by no common sense construction of this agreement, can the plaintiff recover upon it, as an open contract, for logs he has not delivered upon Ferris' bank.

But there is another objection to a recovery. The complaint does not put the case upon the ground of independent contracts, but claims to recover for 3751 (or more) hemlock and spruce logs "sold, and subsequently *delivered*" by the plaintiffs to the defendants, at so much per hundred of each kind. By the contract, the amount was to be from 2500 to 3000 of one kind, (at 40 cents,) and from 500 to 1000 of the other, (at 60 cents.) The amount within these limits, perhaps, was optional with the plaintiffs. (*Disborough* v. *Neilson,* 3 *John. Ca.* 81. *See Leeming* v. *Snaith,* 16 *Q. B. Rep.* 275; *S. C.* 3 *Eng. Law and Eq. R.* 365. *Gwillim* v. *Daniel,* 2 *Cr. M. & R.* 61.) But, as we have seen, not exceeding 1000 logs were delivered. The issue is upon the delivery at Ferris' bank. On that, beyond the first 1000, the plaintiffs entirely failed to make proof; and it appears by the pleadings, that much more than the price of 1000 logs has been paid. An action will not lie for goods sold and

Evans *v.* Harris.

delivered if there has been no delivery. To recover in that action there must be actual or constructive delivery; and the plaintiffs must show that they have actually delivered the goods or enabled the defendant to remove them. If a special agreement has been performed, so as to leave a mere simple debt or duty between the parties, there can be a recovery under a general count of *indebitatus* assumpsit. (2 *Stark. Ev.* 95, 634, 633. 3 *Id.* 1625. *Wood* v. *Edwards*, 19 *John.* 205. *Outwater* v. *Dodge*, 7 *Cow.* 85. *Smith* v. *Chance*, 2 *B. & Al.* 753. *Goodale* v. *Skelton*, 2 *H. Bl.* 316. *Boulton* v. *Arnot*, 1 *C & M.* 333. *Stone* v. *Rogers*, 2 *M. & W.* 442. *Simmons* v. *Swift*, 5 *B. & C.* 257.)

But it is said the title passed by marking and measuring before they were drawn. As we have seen, this would not aid the plaintiffs under this complaint, if there were no delivery. But I do not think, by this contract, the sale was then complete. There is nothing in the letters respecting marking and measuring, except that in the last letter of the plaintiffs, they inform the defendants that the logs are ready to be marked and measured, and ask if they wish to send a person to mark and measure; and if so, they wish him sent that week; or they will choose a trusty man to do it, if the defendants will send their marking hammer. There was no reply to this proposition. But the answer admits that one Hewitt, during the winter, measured logs in pursuance of said contract, nearly corresponding in quantity and quality with those claimed to have been sold, and marked them with the defendant's hammer. Whether Hewitt was selected by the plaintiffs or defendants, or both, does not appear. In *Knight* v. *Hopper*, (*Holt R.* 8; *S. C. Skinner*, 647; *S. C.* 13 *Vin.* 74,) a note in the nature of a bill of parcels was given: "Bought by Amie Knight of —— Hopper, 100 pieces of muslins at 40s. per piece, to be fetched away by 10 pieces at a time, to be paid for as taken away;" and Lord Holt, at nisi prius, thought as the pieces were marked and sealed, that the property passed immediately, and only remained as security for the money. And it was stated in *Stoveld* v. *Hughes*, (14 *East*, 312,) and in which some effect was given to marking, to have

been decided in the house of lords, that changing the marks on the bales of goods in the warehouse, by the direction of the parties, operated as a delivery. (*And see* 1 *Camp. N. P. Ca.* 233, 235; *Ellis* v. *Hunt,* 3 *T. R.* 464.) But in *Whitehead* v. *Anderson,* Parke, B. said it was very doubtful whether an act of marking &c., without any removal from the possession of the carrier, though done with the intention to take possession, would amount to a constructive possession, unless accompanied with such circumstances as denoted that the carrier was intended to keep, or assented to keep, the goods, in the nature of an agent for custody. (9 *M. & W.* 535.) If the goods were in the possession of the vendor, the evidence of change of possession would be still more doubtful. And in *Bill* v: *Bament,* where a question arose under the statute of frauds, the same judge said, that a direction to mark the goods was evidence to go to the jury, *quo animo* the defendant took possession; but there must also be delivery. (9 *M. & W.* 41.) Marking is an equivocal act; it may be for the purpose of taking possession, or merely for that of identifying the property. (*Parke, J. in Dixon* v. *Yates,* 5 *B. & A.* 313.) The latter was probably the object in this case. No doubt there may be a sale of a specific chattel, to pass the property therein to the vendor, without delivery. And indeed where the money is not paid, without right of possession in the vendee. (*Dixon* v. *Yates,* 5 *B. & A.* 313. *Chit. on Cont.* 332-3. *Spartali* v. *Benecke,* 10 *C. B.* 212. *Hodson* v. *Joy,* 7 *T. R.* 440. *Wilmhurst* v. *Bowker,* 7 *Scott,* 561. *Miles* v. *Gorton,* 2 *C. & M.* 504. *Dodsley* v. *Varley,* 12 *A. & E.* 632. *Maberley* v. *Sheppard,* 10 *Bing.* 99.) Where goods are marked, and nothing more is to be done by the vendor, the title may pass. (*Fragano* v. *Long,* 4 *B. & C.* 219.) But mere marking will not have that effect, where something remains to be done by the vendor. In *Acraman* v. *Morrice,* (8 *C. B.* 454,) the trees were felled and the parts (the trunks) that the vendee was to have, were measured, marked, and paid for, and a portion had been delivered; but the vendor was to cut off the tops and take the trees to another place and there deliver them to the vendee. On the former becoming bankrupt, the vendee severed and car-

ried away the marked portions, but was held liable in trover, to ·the assignees. In the case now under consideration, the logs had to be drawn to the place of delivery, after they were marked. Measuring and marking may be, no doubt, evidence of taking possession, or of acceptance. In *Knight* v. *Hopper*, the goods were selected, marked, accepted, and laid aside by the parties, and there was nothing left to be done by the vendor. So in the case in the house of lords, mentioned by Lord Ellenborough, the bales were in a warehouse, and the marks were changed by the parties. In both cases they were appropriated and accepted. In *Stoveld* v. *Hughes*, the property was transferred to a third person, and re-marked by him with the vendor's assent.

Marking by the vendee, may, under circumstances, be evidence of·acceptance. But I have found no case in which it was held to be a delivery, or evidence of delivery, where by the very terms of the contract of sale, the vendor had, afterwards, at his own expense, to transport the property to another place, for delivery to the vendee. If any thing is to be done with the goods, as counting, measuring, weighing, &c. no title will pass. (*Long on Sales,* 267. 6 *Cowen,* 250. 7 *id.* 85. 15 *John.* 349. · 7 *Wend.* 404. 3 *id.* 112. 14 *id.* 31. 15 *id.* 221. 2 *Hill,* 137. 6 *East,* 614. 13 *id.* 522. 11 *id.* 210.) Though it may be otherwise, where nothing more is to be done, even though still in possession of the vendor. (*Bates* v. *Conkling,* 10 *Wend.* 389. *Lansing* v. *Turner,* 2 *John.* 13. *Olyphant* v. *Baker,* 5 *Denio,* 379. *Rugg* v. *Minett,* 11 *East,* 210. *And see* 4 *B. & C.* 219 ; 2 *Scott,* 239 ; 1 *Chit. on Cont.* 335.) After the property has been sold and delivered, no doubt the vendor may, by the agreement of parties, have it in custody as the servant, agent, carrier, or bailee, and with or without compensation ; or may convey it to another place, without affecting the sale. But where, by the terms of the contract of sale, the delivery to the vendee is to be at another place, to which the vendor is bound to transport it at his own expense, something more is to be done by him. Where the delivery is to be at a distant place, as between the vendor and vendee, the contract is

ambulatory till delivery. (*Ashurst J. in Lickbarrow* v. *Mason,* 2 *T. R.* 63. *Conceded arg. per Parke, in Hodson* v. *Lory,* 7 *id.* 441.) The transportation is included in the price in the case now under consideration. The language is "we will deliver to Ferris' bank near Pottersville, from 2500 to 3000 peeled, merchantable hemlock logs, at $40 per hundred market logs," &c. " on the following terms." They were to receive so much a piece for logs delivered at that place, and not for logs measured and marked lying in Minerva. Until the logs were drawn to the place designated, there was no delivery, and the contract was executory.

The judgment must be reversed and new trial granted.

Ordered accordingly.

[WASHINGTON GENERAL TERM, May 2, 1853. *Hand, Cady* and *C. L. Allen,* Justices.]

